Good morning, Your Honors. Jeffrey Abraham for Plaintiff Appellant. May it please the court that I would like to reserve four minutes for rebuttal. This is not my first appearance before the court on this appeal. The first one came in October 2002 when we argued before a panel consisting of Judge Greenberg, Judge Neuengart, and Judge Michel sitting by designation from the Federal Circuit. Given what they said, and maybe you can help me with this, given what we said in Levy 1 and how we specifically identified the absence of guidance or clarification from the SEC, given the Supreme Court's holding in Brandeis and in Smiley v. Citibank, how can you win? Well, I think quite simply, Your Honor. The first thing is that there were real rules of decision in Levy. There was a decision as to the law on 16b7. There was a decision as to 16b3. 16b3 was held to be inapplicable. 16b7... When do you say decision? You're talking about Levy 1. Levy 1 had real rules of law in them. Well, that's why I asked about Brandeis because it seems to me that's exactly the situation we have here. There were real rules of law in Levy 1, but they were based upon an interpretation of an ambiguity and a regulation. We highlighted that and we said in the absence of guidance from or from the SEC, we interpret the regulation that issued there to exclude from the exclusion reclassifications. I understand that, Your Honor. I think that we distinguish Brandeis in our brief as follows. Brandeis involves an interpretation of the statute. And in the context of administrative deference and interpretation of a statute, stare decisis cannot control future agency action. However, in the context of a court's determination as to what a regulation means, Brandeis doesn't apply because the concepts of deference are different. But you've got Seminole Nation. Don't you run the smackdown in Seminole Nation, which basically says it's Chevron transposed to the regulatory scheme and you run into exactly the same problem? Well, I don't think so, Your Honor, with all due respect, because there's a limit to deference. And the limit to deference is what do the words of the regulation mean? What does the regulatory history tell us about what the regulation meant at the time it was first adopted? And what does the regulatory context tell us as well? And I think in that context, the Christensen decision, as well as the Caruso decision, written by Judge Alitos, blockbuster Sony Entertainment, established that where an agency has a regulation that says one thing and it wants to change the regulation, it has to adopt a new regulation. It can't reinterpret the regulation to mean something other. It didn't reinterpret. It amended and changed the language of the regulation. Well, pursuant to a statute which gave it the power to do that. The power to do it. I'm sorry, Your Honor? A statute which gave it the power to do it. The statute gives the SEC the power to adopt regulations. However, when it wants to adopt a new regulation, it has to change the regulation. Otherwise, the old regulation is in effect, Your Honor. And it can only change the regulation prospectively. Well, let's back up a minute. Before you get to the issue of deference, I want to question your, the way you view Levy 1. Yes, Your Honor. Doesn't National Cable say that where the prior construction by the court was not based upon unambiguous terms of the statute, leaving no room for agency discretion, where that has not occurred, then we need, then the agency construction will trump the prior court determination. Isn't that precisely where we find ourselves? Such that Levy 1 is now no longer controlling. Your Honor, I don't think so. Why? Because, I'll tell you why. Because Brandex is talking about in the context of agency  You're talking about National Cable. I said, I'm sorry. I called the Brandex case. Okay, yeah, yeah. I'm sorry. Same thing. Same thing. Okay. Brandex is talking about what happens when there's a statute and an agency issues regulations governing the conduct in a statute. Can a court, in Brandex, the Ninth Circuit, made a determination as to what the statute meant. The agency disagreed with it and came out with a regulation that was different. The Ninth Circuit said, we already decided what the statute meant. Too bad. The Supreme Court took that decision and said, no. You have to go with what the agency says the statute meant. We can't have ossification of the regulatory process in that context. Because you had not found that the terms of the statute were unambiguous. But that was a statute. And this case involves the interpretation of two regulations. What happens to agency construction? Does it really matter? It does matter, Your Honor, because you have the Christiansen decision by Judge Thomas. And in that decision, he says, when an agency wants to issue a new regulation, it cannot reinterpret the regulation. And the nature of ossification is different when it comes to a regulation than when it comes to a statute. That turns in whether, as the second part of your argument, or the third part, I guess, that argument turns in whether or not what the agency did here was a clarification or a change in the law. And if it's a clarification of an ambiguity, then what you're arguing about Christiansen doesn't really help you, does it? Then we're back into the big smiley. Your Honor, I guess the nature of the litigation here in Levy 1 establishes when Judge Greenberg wrote the decision. He looked for traditional standards of regulatory interpretation, which are similar to statutory interpretation. He looked at the language of the rule. He looked at the regulatory context. He looked at the regulatory history and all the adopting releases accompanying it. He did say, didn't he, somewhere, that the regulation was ambiguous? He said, I think he said there was room to interpret it, but he was able to interpret it. At some level, every... Specifically, he said, in the absence of specific SEC guidance about which reclassifications are exempt from Section 16b, under Rule 16b-7, we believe that two principles should guide us in determining which reclassification should be included in 16b-7, and then he gets into the two principles. But he's clearly saying that, as I said earlier, in the absence of any clarification or gloss from the SEC about the kind of reclassifications that... Clearly, some reclassifications were exempt. The issue in Levy 1 was whether or not that kind of reclassification fell within the exemption. Your Honor, I think you take that, and you should take the history of Levy subsequent to that decision, when we had a petition for a hearing, and a petition for a hearing on Bank Proceeding, in which there was full briefing. The SEC put in a brief. There were multiple briefs put in, and the SEC came in and said, vacate your decision, Third Circuit. Here is our guidance. This is what Rule 16b-3d and Rule 16b-7 always meant. Well, but they did that in a brief. It's not... But that brief would be entitled to deference as well. Well, I'm not sure it would. None of the briefs represents only the position of the staff and not the position of the Commission. That's very different. Very often we have that situation, people arguing, and we see it differently. And clearly, the Court in Levy 1 saw it differently. Well, Your Honor, I believe the decisions on deference established at a brief, and in the case of the SEC, an SEC amicus brief has to be, I believe, approved by the Commissioners, but you can ask Mr. Caputi that. I'm... That's a concession that could impact the argument today, if you really... I believe that's the procedures they follow, Your Honor. I believe that when the panel indicated that it adhered to its decision, that you had a decision, you had a case where there were rules of law decided by the Third Circuit, and they applied to this case going forward. Why don't you get to your issue of substantive versus, you know, clarification change? You're I see that, Your Honor. Your Honor, it's important... Unless you want to do that on rebuttal. I'll try to get everything I can in here. The point in here is that it was a substantive rule of law. This is not a collateral issue to the case, 16b3 or 16b7. Under the used decision by the Supreme Court under Landgraf, the change in the language of Rule 16b7 and Rule 16b3 operates as substantive change in the law. Well, the 16b3, the change there only said, we meant what we said when we said it doesn't have to be compensatory. So, I mean, how can that be a real change when all it did was clarify that the previous language that was previously there was there for a reason and meant something? Well, Your Honor, the actual language that was there was grant, award, or other acquisition. I think that Judge Greenberg looked to the actual language, the principles of statutory interpretation, regulatory interpretation, the regulatory context. There was one line taken out of the snippet, a snippet of regulatory history, which Judge Greenberg correctly, I believe, interpreted in another way in the context of all the regulatory history. Well, we said that all the compensatory discussion outweighed the specific language that says it didn't have to be compensatory. And all that the new rule said was, you know, that last part that you looked at didn't think it was outweighed really meant something. Well, Your Honor, it did it by changing the rule. The language of the rule issued a whole new regulatory lease. It's an entirely new rule, and it's not No, but that's always what happens, this entirely new rule. We still need to determine whether it's clarifying or substantive change, as we discussed in Marmoleos. Under every one of the tests established to determine whether a rule is substantive or to make the rules. The SEC, in its own rules, describes its rulemaking authority as being legislative in nature. It put it in the sections of rules dealing with legislative But don't we have to look at what, I'm sorry to interrupt you, but, you know, that's what happens when a rule, a new rule is enacted, you know, all the time, what you're talking about. Don't we have to look and see exactly what it does vis-a-vis what was there before? Well, what it does, Your Honor, quite frankly, is under the previous Levy decision, the plaintiff would have been entitled to recover. And under the new rules, it prevents the plaintiff from recovering. That's the very essence of the substantive change in the law. But that doesn't mean it's a new change. That doesn't mean that it's a change in the law. It simply means that we got it wrong. Not in the unbiased sense of getting it wrong, but the clarification that we longed for in Levy 1 and decided the case in the absence of, the clarification subsequently comes and says that we were, in fact, wrong. I'm out of time. I mean, there was something I was going to say from a prior decision of the Third Circuit. I could hold it for rebuttal or I could say it now. Your Honor, when you say we got it wrong, I don't think you got it wrong. And I've put a lot of briefing in on that. But even if you got it wrong, the principles of stare decisis establish that that is the decision of the Third Circuit. And to overturn it creates a substantive new rule of law. And in the allegation So it should be en banc Levy 1. Is that what you're arguing for? Well, the panel reaffirmed Levy 1. That's the first thing. And en banc Levy 1, the petition was denied as well. I think it's not just the en banc denial. I think it's also the panel denial. But that happens whenever, 90% of the time, when a petition for re-hearing is sent, it's automatically petitions for panel re-hearing as well as court re-hearing. And when it's denied, if a subsequent decision comes along, subsequent panel decides that first panel was wrong, we ask the court to reconsider the first decision. I'm not sure it's necessary here, given what I said about Brand X and Smiley. But it seems to me what you're arguing for would make that something which you'd welcome, that we say we should reconsider Levy 1. Well, Your Honor, let me just read from this. I know I'm out of time. And I think it might be fair to my adversaries to read from this decision so they would have an opportunity to respond to it. If not, I'll hold it for rebuttal. Well, why don't you hold it for rebuttal? What decision do you want to read from? Levy 1? No, I was going to read from Allegheny General Hospital, which is at 608 F. 2nd, 965, Your Honor. Okay. May it please the court, I'm Stephen Fierson, and I represent the appellees in this matter. I want to get one thing out of the way quickly, if I may, which is this notion that this court had the benefit of SEC guidance on the petition for rehearing. As the court is well aware, a decision on a petition for rehearing is not a decision on the merits. There's a whole long string of cases from this court saying that for obviously good reasons, because there are a whole host of reasons why courts of appeals decide not to rehear a case at a certain point in time. For example, when this case was up last time, we were at the motion to dismiss stage. It might simply have been that the court felt that it could wait. And especially in the context of, as the court has pointed out, the panel said that guidance from the SEC was lacking. Perhaps at a later point in time, the guidance from the SEC would be exactly the situation we have here. Secondly, when the SEC put in the brief, it only put in the brief on the issue of the petition for rehearing. It didn't put in the brief on the substantive merits of the dispute. It said, for all the following reasons, we think the court ought to rehear it. So we ought not to get confused about that. Mr. Abraham has, since the petition for rehearing has been denied, consistently tried to use that as sort of leverage to say, oh, jeez, the court of appeals actually had guidance from the commission and that the decision has been made and that's just not the case. Again, focusing on the lack of guidance language that Your Honor read, I think it's interesting to note not only that that would seem to us to be the epitome of a decision which calls out for clarification, but it's interesting to note that the Second Circuit in the Brew decision actually pointed to that. In other words, when in that case the argument was made, jeez, you should do what the Levy Court did, the Second Circuit said, well, wait a second. The Levy Court said it did what it did in the absence of guidance from the commission. We now have guidance from the commission. We have to take a look at the guidance from the commission. But the Brew Court also found that even without  Well, what it did, I think that's actually a little unclear, Your Honor. I think what the court did was to say, we don't have to deal with the new rule because we find the old rule, right, controls. But they did look at the new rule and the adopting release to determine what the intent of the commission always was back then. So they used it the same way courts generally use adopting releases and other statements from agencies that interpret their own regulations. One of the arguments that Mr. Abraham made to try to get past the National Cable Brand X case is, oh, jeez, that was had to do with a statute and not a regulation. We would have two responses to that. The first response is there's actually slightly more deference owed when an agency is interpreting its own regulation, not surprisingly because it's their regulation and it's their intent that matters. And secondly, in Mar-a-Lagos, the court dealt with an interpretation of a regulation, not the interpretation of the statute, as do loads of other cases. And as the court pointed out, it's really the same analysis. I mean, if you look at what the Chevron test is, you can't overturn the agency's view unless it's arbitrary, capricious, or contrary to the statute. Well, in Mar-a-Lagos, it was a guideline. It was a guideline and the agency came back. In other words, it wasn't a statute. But Congress, by letting guidelines go into effect, in effect, are legislating? Well, but you could argue the same thing here. The Congress, by giving to the Commission the right to figure out what the exemptions are, are doing a similar sort of thing. I mean, there's really, I don't think, much of a substantive difference there. So whether you look at the Mar-a-Lagos, whether you look at Brand X, whether you look at the whole host of other cases we cite, the principle is the same, which is, courts have to make decisions when cases are in front of them. I mean, they can't just say, geez, it's unclear, we're sorry, we can't figure it out. They're going to make a decision. You'd like to be able to do that, but you can't. And so later, when the agencies come in and say, geez, in the past we've been clear, here's what we always meant, because it's their job to figure out what the regulation means in the first instance. That will control. And the discussion, I agree with the court, the discussion in Brand X about the balance between when you give effect to what the court said and when you give effect to what the agency said, I think, controls here. And in essence, comes down to this difference between clarifying and substantive. And as the Supreme Court made clear, and as this court made clear in Mar-a-Lagos, the mere fact that a court decides something doesn't make it substantive. In Mar-a-Lagos, this court, in fact, said, in fact, one could posit that quite the opposite was the case, that the new language was fashioned to clarify the ambiguity made apparent by the case law. In other words, the court itself points out the ambiguity, which is exactly what happened here. What happened here in Levy 1 is the court said, with respect to 16b7, we know it pertains to at least some reclassifications. We just don't know which ones, and the Commission hasn't been terribly helpful, or at least we feel the Commission hasn't been terribly helpful in letting us know. Which is stronger, the B3 or the B7? We only need to find one, correct? Which do you think is stronger? It's a little bit like trying to choose between your children. I think they're both really strong in the sense that, given the statement by the Commission about what each one means, I think they're both, they're almost equally strong. If you ask me, I mean, the reclassification has strength because it's an issue of form over substance, what the Commission's actually saying there is, as long as the substance of the transaction doesn't change, the substance of the investment just changes the form. Well, but it was required that there be a merger or a consolidation before, and this is not a merger or a consolidation. So did it not affect substantive change? It did change the risk. That part of Levy 1 didn't change. Yeah, I mean, the risk didn't change. As far back as 1981, the Commission said you can treat, can treat reclassifications in the same way. They put the word reclassifications in the title for a reason, although... No, but we don't give effect to titles. Well, but what the Court does give effect to is the intent of the agency. So it isn't a question of sort of, the question really isn't should, because they put it in the title, are we bound by it? That's not the question, because the answer to that, Your Honor, is absolutely correct. The answer there is no, because it's in the title. It's a different question, I would suggest. The different question is, does that tell us anything about the agency's intent, especially given the history of this thing, which is in 1981, it says it can apply to reclassifications. In 91, it puts it in the title. It has the no action letters in St. Charles and Monk Austin dealing with reclassifications. In 2002, in amending the rules for the filing of the Form 8K, it refers back and says reclassifications are exempt under 16b-7. But is it clear that the SE believed that every reclassification... No, and that... See, that's where you have the problem, that it affected change, whereby now all reclassifications... The issue, if the question is, was it clear from those outward manifestations that every reclassification was covered, the answer is, not that clear, which is why we have leave you want. That's different from saying, was it always the Commission's intent to exempt all reclassifications? They didn't do a very good job, they may not have done a very good job of saying it, but the issue here is, the way the standard is set up is, when you now look at it, and the Commission has said, that's always been our intent. And unless there's something in the language itself, or alternatively elsewhere, that compels, and that's the word that the cases use, compels a different conclusion, then you have to go with what the agency says its intent always was, because they are the ones who know what their intent always was. The rest of us, in the absence of a clear statement, which we now have, have to try to define that. What's your best case on that point, that the regulation doesn't say that reclassification is included, but we define the intent of the agency and say, that's what it meant, so that's what it is? I think the best argument for that is that it must necessarily have been included. And let me just give you one example. When folks out in the real world are structuring these cases, they're structuring them to be a merger. I mean, there's no reason except convenience to do it one way or the other. So, for example, they could have created a new entity with its own stock, and then merged the existing entities into the new one, and all the shareholders would have had the new stock. Instead, what they did was, they said, well, we're not going to do that. We'll do something else. We'll do a different corporate transaction, which is, we'll take the stock you have, and we'll reclassify it into the same kind of stock you would have had, had we done the merger. So, I think the point is that, again, reclassifications necessarily would have had to have been included. They're essentially the same thing doing the same thing, which is simply changing the form of the investment, not the investment itself, not the economic value of the investment. I'm kind of surprised about your emphasis or your focus on B7, because I thought that B3 was actually a stronger case. Well, I think, well, maybe it's an easier case, because you don't have the title problem, and when you have a reclassification like you have here, essentially what happened pre-IPO is the investment bankers, and this is all in dispute of the record, the investment bankers come in and say, if you guys want to do an initial public offering, if you want to go sell stock to the public, you better not go try to do that when you have this huge preferred position, which would be above the common stock, because the common stockholders would, not surprisingly, say, or the ones who were thinking about buying it would say, well, I don't get it. What are they so worried about that they won't be at the same level with me? It's not very complicated. So, the bankers say, if you want to sell to the public, you better get down on the same level with them and take the same risks that they're taking. This happens every single time. It's typical corporate housekeeping before you do an IPO. So, the then existing shareholders, before the IPO, before the public gets involved, get together and say, okay, the investment bankers are telling us we have to get rid of the preferred. At this stage, there were essentially three shareholders. There was Sterling, there was National, and there was the management group, the top executives held shares. And the three of them got together and said- We know what happened. Why don't you, because Mr. Abraham wanted to make a point and I did because his light was on. So, maybe you should wrap up your answer. Thank you very much. Your Honors, may it please the Court, my name is Alan Caput. I represent the Securities and Exchange Commission. You want to let's you at the table, Mr. Caput? Excuse me? As helpful as your brief was, did you think they'd let you at the table? We ought to re-offer. Oh, okay. Your Honors, the Commission did submit an amicus brief in this case. It was the Commission that submitted the brief. I sat down with the Commission, we discussed the brief, and the Commission voted unanimously to send a brief to the Senate. Is that on record? No, actually, I just divulged our information. I thought you were going to say, I just made that up. It's on the record somewhere in the minutes of the Commission that they approved the brief. Your Honor, in the short period of time that I have, I'd like to focus on the Commission's authority to adopt Rule 16b-3 and Rule 16b-7. The authority for the Commission to adopt these two rules can be found in two clauses that are located in Section 16b. The first clause states that the Commission may exempt any transaction as not comprehended within the purposes of Section 16b. Not comprehended within the purposes of Section 16b. The second clause tells you what the purposes of Section 16b is, and that clause is found in the first sentence of Section 16b. It says the Commission, it says that Congress enacted Section 16b for the purpose of preventing the unfair use, the unfair use of inside information. We didn't focus on that in AB1. Arguably, we could have really focused on that purpose in AB1 and gotten the same result, but really, we didn't focus on it that much. How much should we focus on it now? We should focus on it because, Your Honor, the Supreme Court has said that if you look at the purpose, if you look at the purpose of Section 16b, what the Supreme Court has said four times is that what the purpose of Section 16b is, is to prevent those situations where an insider, using inside information, non-public information about the company, trades with the investing public. And I can read from Formos McKesson. Formos McKesson says the general purpose of Congress enacting Section 16b is well known. Congress recognized that insiders may have access to information about their companies not available to the rest of the investing public. By trading on this information, those persons could reap profits at the expense of less well-informed investors. Now that's important for these rules because these rules are coming in the Commission's authority if they exempt transactions that do not lend themselves to the kind of insider trading that Section 16b was directed at, which is trading with inside information with the public. Rule 16b3d exempts only trades that are with the issuer and the insider. There are no trades with the public involved here. And there therefore cannot be any insider trading, any unfair use of inside information that is contemplated within the purposes of Section 16b3d. And that is what the Ninth Circuit concluded in Dryland v. American Express. The Commission has always said, as to Section 16b3d, that it was not intended to have a compensatory purpose. And again, those kinds of trades are not comprehended within the purpose of Section 16b because they don't involve the public. As to Section 16b7, what's happening here, and the Commission has always, always said that this rule applies where there's cross-ownership of 85%, which would include a reclassification. With 16b7, the transactions that are exempted are transactions where the insiders essentially are acquiring what he already owns. He's acquiring the same amount of ownership interest that he had before. In a reclassification, one class of securities holders is essentially, or is, exchanging their securities for another class of securities on the same terms. On the same terms. Not only is there not any informational disadvantage, there's no disadvantage at all. Now, the Commission didn't put, it's interesting, the reason why the Commission didn't put reclassifications in the body, just put it in the title, because it's silly to talk about reclassifications meaning an 85% test. Reclassifications are always 100%. It's 100%. I think also, I would say, as to b7, when the Commission put that in the title, it didn't just put reclassifications in the title. It adopted the earlier interpretation. The Commission, in 1991, adopted the earlier staff interpretation in 1981. It did more than just simply put it in the title. Thank you very much. Thank you. Chairman, before we begin, maybe we can help with the whole concept of transactions that have the potential for abuse vis-a-vis the marketplace. Now, how would reclassification, and maybe you're arguing that we should not be that narrowly focused, but to the extent we can be and should be that narrowly focused, how would reclassification run the kind of risk vis-a-vis the marketplace, advantaging some folks, given the general public in the marketplace, that are insider trading that we normally think of would? Well, you heard Mr. Fearson say that the preferred stock and the common stock was not at the same level. So, when I take the preferred stock and I get preferred stock in exchange, I made a purchase. And the very same potential for speculative abuse exists when I go into the marketplace and buy stock for cash. It exists when I take another piece of paper and I get stock for that as well. The prophylactic purpose of 16B is to prevent corporate insiders from manipulating corporate events so as to profit from purchases and sales within six months. And I disagree with Mr. Caputti. Quite frankly, I'd like to argue more about retroactivity, Your Honor. But I disagree with Mr. Caputti that it's just directed at cases where there's an uninformed market participant on the other side of the transaction. Because, as an insider, stepping into the shoes of an insider, I have the same ability and same incentive to manipulate events if I buy or sell from the company as if I buy or sell from the public investor. And what 16B is directed at in the aftermath of the Great Depression is market manipulations where insiders kind of manipulated corporate events by buying and then selling quickly or within six months by causing, I don't know, dividends to be declared or undeclared or whatever the corporate events were. And there are different manifestations of corporate events that take place in different ages. But when you're buying, when you sell within six months, that was Congress's judgment that it was an inherently abused, potentially abusive series of transactions and there should be a per se rule that profits should be disgorged. All profits should be disgorged. They wanted to squeeze all the profits out of it. So the short answer, Your Honor, is that it's just as much a purchase as going into the market and buying it for cash when you have a reclassification. I want to address myself, if I can, to the issue of retroactivity because the decisions of Marmelaos and Brandex keep coming up. In our reply brief, we note that Marmelaos was subsequently distinguished by this court and the decision by now Justice Alito that where the new construction is inconsistent with the prior decision by the court, it's a substantive rule of law. And that decision is U.S. v. Roberson. It's cited on page eight of our reply brief. This court in U.S. v. Diaz in a letter I recently sent to this court and the D.C. Circuit similarly in the national mining case held that if there's a new regulation which is substantively inconsistent with the prior decision of any court of appeals, it's substantive in nature. And Diaz is pretty clear. I think it's a pretty comparable situation. I'm not going to say it's on all fours. And it's in the letter we sent to the court on March 18 that when you have a new circuit court decision, a new rule, which essentially a sentencing guideline is, intended to overrule a decision by this court, as that happened in Diaz, it's a substantive rule of law. And it can't be applied retroactively to the case. So we have that. You have the Mary decision from the D.C. Well, we said something diametrically opposed to that in Marmelaos. So can Diaz say something different without being embanked?  But I think in Marmelaos, I don't know that there had been already a third circuit decision. I think the distinction is in Diaz, there was a third circuit decision that was on point, which was the Smith decision. And that the new sentencing guideline, I think it was Amendment 591 in the Diaz case, was seeking to overrule the Smith decision by the court. And even the Sentencing Commission's report specifically mentioned the Smith decision case, much as the SEC's new rules, the adopting release, as mentioned, the Levy decision. So I really believe that the Diaz case is on point, as is the National Mining decision. Although, here do we have something that's totally inconsistent? Because it's on different facts. Well, addressing myself to the Rule 16b3d, which I guess you feel is my adversary's strongest point, and therefore my weakest. No, I don't know whether it is or not. I'm just curious that so much of the argument pertains to b7. Okay. Your Honor, just for example, on 16b3d, this court held that 16b3d is inapplicable to this case. If it's inapplicable and you have a new rule, which changes it to be applicable and controlling, that's a new rule of law. Well, but we really decided we weren't sure on balance how to read 16b3. And we clearly were weighing and trying to figure it out. And we made the best of a bad situation, if you will. You're right, Your Honor. You might say that, except for the fact that the circuit, that panel, said it was inapplicable. I mean, that is a clear statement of law. It's at page 124 of the decision. Rule 16b3d is inapplicable. But the reasoning wasn't dicta. The reasoning was part of the decision. The reasoning is part of the decision, but there's a final decision that it's inapplicable, that it only relates to compensation-related transactions. It reaches its decision based upon an analysis of the language of the rule, the regulatory history, and the regulatory context. But there is a rule of decision in there. And at the very least, I think everybody would have to admit, if the SEC never came out with a new rule, we have the rule of decision in the Levy case. Your Honor, just in closing, and by the way, the Brandeis decision only applies to cases prospectively, in addition to all the prior distinctions that I mentioned between interpretive rules of the statute and changing the meaning of a regulation. But in the Allegheny case, this Court said almost 30 years ago that we must reaffirm certain fundamental tenets of the doctrine of stare decisis and then reassert the power of the federal judiciary to interpret statutes enacted by Congress. The essence of the common law doctrine of precedent of stare decisis is that the rule of the case creates a binding legal precept. The doctrine is so central to Anglo-American jurisprudence that it scarcely needs to be mentioned, let alone discussed at length. A judicial precedent attaches a specific legal consequence for a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or lower court in judicial hierarchy. When someone has read as long as you have and then starts turning the pages, I get nervous. No, it's going to be no more. I'm a quick talker. I'm going to skip ahead a little bit to make it quicker. A decision by this Court... This is tough. We get your point. What we say matters, right? A decision by this Court, not only by the United States Supreme Court, it's a decision of the Court of the last resort in the Federal Judicial Circuit. I would like to read 10 more seconds, but I don't think Your Honor wants to hear it. Thank you very much. It's not that I don't want to hear it, it's that I shouldn't, because I'm more restricted with Mr. Houston and Mr. Caputa. Thank you, Your Honor. Thanks an awful lot. We'll take the matter under advisement. Very well argued on both sides.